**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

UNITED STATES OF AMERICA,              :
                                                        :
v.                                                       :    CASE NO.: 7:25-CR-20 (LAG) (ALS)
                                                        :
CHARVEZ THOMPSON,                       :
                                                        :
          Defendant.                             :
                                                        :

## ORDER

Before the Court are Defendant's Motion to Suppress Statements (Doc. 28) and Brief in Support of Motion to Suppress Statements. (Doc. 44). For the reasons below, Defendant's Motion to Suppress Statements (Doc. 28) is **DENIED**.

## PROCEDURAL BACKGROUND

On August 12, 2025, Defendant Charvez Thompson was charged with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (Doc. 1). On September 12, 2025, Defendant filed a Motion to Suppress Statements (Doc. 28), a Motion to Suppress Evidence (Doc. 29), and a Motion to Dismiss Indictment (Doc. 30). That same day, the Government responded to the Motion to Dismiss Indictment. (Doc. 31). At the September 23, 2025 Pretrial Conference, the Court denied Defendant's Motion to Dismiss Indictment and continued the trial pending an evidentiary hearing on the Motions to Suppress, which the Court set for October 8, 2025. (Doc. 33). Pursuant to the Court's instruction at the Pretrial Conference, the Government timely responded to both Motions to Suppress on October 1, 2025. (*Id.*; Docs. 34, 35). On October 7, 2025, Defendant filed a Motion to Continue the evidentiary hearing, and the Court rescheduled the hearing for October 29, 2025. (Docs. 36, 37, 39).

At the evidentiary hearing, the Court denied Defendant's Motion to Suppress Evidence[1] (Doc. 29), but granted the Parties leave to file supplemental briefing as to the Motion to Suppress Statements (Doc. 28). (Doc. 43 at 46:6–7, 47:10–17). Defendant timely filed his Brief in Support of Motion to Suppress Statements on November 25, 2025 (Doc. 44), and the Government timely responded on December 12, 2025. (Doc. 45). Defendant did not reply. (*See* Docket). The Motion to Suppress Statements is now ripe for review. *See* M.D. Ga. L.R. 47.2.

## FACTUAL FINDINGS

Defendant seeks to suppress an array of statements made in response to questions from officers generally asking (1) what caused and happened during the altercation with Camille Thompson (Thompson), Defendant's mother; (2) whether Defendant had a gun; and (3) where the gun was. (Doc. 44 at 9–10). At the evidentiary hearing the Government offered the testimony of Officer David Fawcett and the Defense offered the testimony of Eric Phillips. (*See generally* Doc. 43). Upon review of the witness' testimony, the Parties' briefing, and the body camera footage[2], the Court makes the following findings of fact.

On June 22, 2024, Officer Fawcett responded to 1302 Bethune Drive (the Residence) regarding a reported assault. (Doc. 35 at 1; Doc. 44 at 1). The complainant, Thompson, alleged that Defendant pistol whipped her and was trying to flee the scene. (Doc. 35 at 1; Doc. 43 at 20:15–21, 21:13–19; Doc. 44 at 1). When Officer Fawcett arrived at the Residence, Thompson immediately approached his vehicle, yelling for the officer to look at her face and that Defendant had pistol whipped her. (Govt. Ex. 1 at 00:54–01:21 (on file with the Court); Doc. 43 at 21:21–22). Officer Fawcett attempted to gain control of the scene, telling Thompson to "Hold on. Be quiet and stand over there" and telling

---

[1]    The Court found that, notwithstanding the issue of whether Defendant had standing to challenge the search of the Dodge Ram, there was probable cause to support the search. (Doc. 43 at 46:6–47:10).

[2]    The body camera footage initially was attached to the Government's Response to Defendant's Motion to Suppress Evidence (Doc. 34): Officer Fawcett's body camera footage was attached as Exhibits 1 and 2 (Govt. Ex. 1, Govt. Ex. 2), and Officer Clark's body camera footage was attached as Exhibit 3 (Govt. Ex. 3). Officer Fawcett's body camera footage also was admitted during the evidentiary hearing as Defense Exhibit 1. (*See* Doc. 43 at 15:3–10). For consistency, the Court cites the officers' body camera footage as Government's Exhibits throughout the Order.

2

Defendant "Show me your hands. Show me your hands. I'm going to detain you until I know what's going on." (Govt. Ex. 1 at 01:21–25). Defendant raised his hands and started trying to explain what happened. Officer Fawcett told Defendant to turn around and again informed Defendant that he was going to detain him "until [he knew] what [was] going on." (*Id.* at 01:25–31).

Officer Fawcett repeated the command to turn around several times; but, by the time Officer Fawcett reached Defendant, Defendant still had not turned around. (*Id.* at 01:31–33). Officer Fawcett told Defendant, "I am about to tase you." (*Id.* at 01:33). Officer Fawcett drew his taser, which had a laser site, pointed it at Defendant, and again threatened to tase him if he didn't comply. (*Id.* at 01:35). Within a few seconds, Defendant turned around and put his hands behind his back. (*Id.* at 01:38–40). Officer Fawcett began handcuffing Defendant, told Defendant that he was going to listen to everything Defendant had to say, and asked Defendant to keep being reasonable. (*Id.* at 01:43–55). Defendant stated, "I got you. I'm on probation. I have no reason to lie to you." (*Id.* at 01:54–58). Officer Fawcett told Thompson to be quiet several times while securing Defendant. Officer Fawcett testified that he intended to wait for another officer to arrive so that he could separate Thompson and Defendant, find out what had happened, and see if there were any independent witnesses. (Doc. 43 at 23:1–4).

As Officer Fawcett secured the handcuffs, he asked Defendant if he had a gun. (Govt. Ex. 1 at 02:11–12). Defendant responded, "No sir." (*Id.*). Officer Fawcett told Defendant that he would try to figure out what Thompson meant by "pistol whipped;" and Defendant responded that Thompson was intoxicated. (*Id.* at 02:13–17). Officer Fawcett then told Defendant that he would adjust the handcuffs so they wouldn't get any tighter and thanked Defendant for his cooperation. (*Id.* at 02:24–28). Defendant said, "I'm not going to move because I haven't done nothing. We just got done saving my truck from getting freaking repo[ssessed] and because [Eric] [3] didn't call her, and she's been drinking all day. She's been acting a fool. This is why I moved from over here." (*Id.* at 02:27–44).

---

[3]    Eric is Thompson's husband and the owner of the Dodge Ram. (Doc. 35 at 4 n.1).

3

In response to Defendant's statement, Officer Fawcett asked, "So what is she talking about then, about this supposed injury to her face?" (*Id.* at 02:45–48). Defendant replied, "I don't . . . know . . . besides the fact I got hit in the god dang face." (*Id.* at 02:45–55). Thompson walked toward Officer Fawcett and Defendant, demanding Defendant to tell the truth. (*Id.* at 02:57–03:07). Officer Fawcett told Thompson that he would deal with her as soon as another officer arrived. (*Id.*). Defendant continued talking and said, "My grandmother just turned 74, and you can coax her into buying a god dang coke bottle. I've been with her boyfriend all day. We just pulled up and she went god dang banana sandwich." (*Id.* at 03:36–04:00).

Defendant continued talking while Officer Fawcett patted him down. Defendant said, "This sh*t's f*cking crazy. Once this is said and done, I'm sleeping. . . . I'm pushing my truck down the road. I can't deal with this. I'm stressed out enough trying not to go to freaking prison . . .  And this ain't the first time that she's gonna put hands on me and then try to . . ." (*Id.* at 04:16–27, 04:32–44). After Officer Fawcett finished the pat-down, he asked Defendant what happened, to which Defendant responded, "We pulled up. She's out here blaring the music. I asked her kindly to turn it down please because I had a headache. . .," and then began explaining that he was trying to move his belongings out of someone's yard. (*Id.* at 04:51–05:19). Officer Clark arrived, and Officer Fawcett briefly interrupted Defendant to ask Officer Clark to "get with the complainant . . . and get a preliminary statement from her." (*Id.* 05:20–26). Defendant continued his response to Officer Fawcett's question and said, "I . . . we been trying to save my stuff for weeks. And I finally got his truck finished, to run at least, so we went and got my truck. We are supposed to go in the morning to get my dump truck, but we pull up and she is tripping out. She's been acting a fool since we been home." (*Id.* at 05:30–49; Doc. 35 at 2–3; Doc. 44 at 3). As Defendant spoke, Officer Fawcett shone a flashlight on Defendant's face to look for any "obvious injuries." (Govt. Ex. 1 at 05:47–55).

Officer Fawcett then asked Defendant for his identifying information and wrote it down on a notepad. (*Id.* at 06:02–48). Defendant told Officer Fawcett that he had been in the heat all day and asked Officer Fawcett to get his (Defendant's) drink out of the Dodge

4

Ram, which was also parked in the driveway. (*Id.* at 06:50–57). Officer Fawcett asked Defendant to wait a second while he ran Defendant's identifying information via radio. (*Id.* at 07:04). Officer Fawcett then told Defendant, "Walk over here with me. Where's your drink?" (*Id.* at 07:22–23). As Officer Fawcett got Defendant's drink from the Dodge Ram, he asked Defendant, "What is she going to say happened?" (*Id.* at 07:55). Defendant responded, "I don't know what she is going to say to be honest with you." (*Id.* at 07:56– 08:05). Officer Fawcett directed Defendant back to the Ford F-150. (*Id.* at 08:00–05). Officer Fawcett again told Defendant that Thompson had mentioned "pistol whipping" and asked Defendant if he had a weapon. (*Id.* at 08:07–10). Defendant responded, "No sir." (*Id.* at 08:10). Officer Fawcett poured the drink into Defendant's mouth and then placed the drink on the hood of the Ford F-150. (*Id.* at 08:15–20, 08:27–28). Officer Fawcett again asked Defendant how Thompson got the injuries to her face, and Defendant responded, "Injuries to her face? Probably when she freaking hit me . . . no freaking tackled me. She's intoxicated and looks like she's probably high on something." (*Id.* at 08:30–40).

Officer Fawcett pointed at the Dodge Ram and asked Defendant whether there were any weapons in that vehicle. (*Id.* at 08:54–56). Defendant looked at the Dodge Ram and said, "Nah, I wasn't in that truck." (*Id.* at 08:56–59). Officer Fawcett told Defendant that, when he first arrived on scene, he saw Defendant standing near the Dodge Ram. (*Id.* at 08:59–09:02). Defendant said something about his cigarettes; and, as he and Officer Fawcett walked over to the Dodge Ram, Defendant asked, "Actually could grab my cigarettes please?" (*Id.* at 9:08–21). As Officer Fawcett opened the front passenger door to the Dodge Ram, only a cell phone was visible on the front seat. Defendant identified the phone as his and asked Officer Fawcett to grab it for him. (*Id.* at 09:21). Once Officer Fawcett placed the phone in Defendant's back pant pocket, he asked Defendant what else belonged to him in the Dodge Ram and looked for Defendant's cigarettes. (*Id.* at 09:22– 27, 10:02–04). Defendant said, "I threw my stuff in here because Eric was going to take me to my friend's house because I don't want to be around this." (*Id.* at 09:27–37). Officer Fawcett conducted a cursory search of the Dodge Ram, looking under the seat, in the glove compartment, and in the back seat. (*Id.* at 09:37–10:20). Officer Fawcett again asked

5

Defendant who the Dodge Ram belonged to, and Defendant again identified the vehicle as Eric's. (*Id.* at 10:20–24).

Just after Officer Fawcett put Defendant's phone in his pocket, Officer Clark approached and asked Defendant if he had anything in his boot. (Govt. Ex. 1 at 10:05–07; Govt. Ex. 3 at 04:20). Defendant responded, "No ma'am . . ." (Govt. Ex. 1 at 10:07). This question was prompted by Thompson's statement that, while Defendant was hitting and stomping on her, he pulled a gun out of his boot and started hitting her with it. (Govt. Ex. 3 at 03:47–51).

After Officer Fawcett finished searching the passenger side of Dodge Ram, he asked Officer Clark to stand with Defendant. (Govt. Ex. 1 at 11:09–12). A second later, Officer Fawcett told Officer Clark, while pointing at the Ford F-150, "He has a drink over there, you can take him back over there." (*Id.* at 11:13–17). Officer Clark and Defendant walked to the driver's side of the Ford F-150 where Officer Clark poured the drink into Defendant's mouth. (Govt. Ex. 3 at 05:33–38, 05:45–06:11). Officer Clark asked Defendant, "So what happened tonight?" (*Id.* at 06:19–20). Defendant responded, ". . . come home, they'd been arguing, me and Eric had been . . ." (*Id.* at 06:20–27). Officer Clark interrupted Defendant when she shone her flashlight on Defendant's face to look at the scratches, but Defendant continued, "Yeah . . . I am not going to put my hands on her no matter how many times she beats me and all that sh*t." (*Id.* at 06:25–37). Officer Clark followed up with, "How did she get the knot on her head?" (*Id.* at 06:38–40). Defendant replied, "Probably when she tackled me, that's how I got the scratches on my face." (*Id.* at 06:41–45). After a couple of minutes of Defendant venting about Thompson to Officer Clark, Defendant reached into his back pocket to retrieve his cellphone. (*Id.* at 08:31–43). As Defendant unlocked his cellphone, Officer Clark told him, "Don't make no phone calls or nothing. At least not right now." (*Id.* at 08:45–53). Defendant nodded, and Officer Clark helped Defendant put the cellphone on the hood of the Ford F-150. (*Id.* at 08:54–59). Officer Clark said, "Whenever we figure out what's going on then we'll let you make a phone call." (*Id.* at 08:59–09:02).

Both Officer Clark and Officer Fawcett interviewed Thompson, and Defendant's grandmother, Sandra Thompson-James (Thompson-James). (*See generally* Govt. Exs. 1,

6

3). Thompson told Officer Clark that Defendant kicked her in the back, hit her, stomped on her, and beat her with a pistol. (Govt. Ex. 3 at 00:51). Thompson-James corroborated Thompson's story that Defendant kicked her in the back, hit her, stomped on her, and beat her with a pistol. (*Id.* at 00:55). Thompson-James said that she had witnessed the attack and agreed to give a statement. (*Id.* at 2:09). When interviewed by Officer Fawcett, Thompson-James stated that she was in her bedroom watching the television when Thompson entered the bedroom asking to use Thompson-James' phone because Defendant had taken Thompson's. (Govt. Ex. 1 at 13:21–13:48). Thompson-James further recounted that, although she didn't see it, "apparently" Defendant and Thompson had gotten into an altercation in the front yard and Thompson went into the house to call the police. (*Id.* at 13:50–14:03). Thompson-James stated that everything "jumped off" after Thompson grabbed the phone out of Thompson-James' hand to call the police. (*Id.* at 14:17–14:29). Defendant jumped toward Thompson, punched her, threw her onto the ground, continued to "beat her with his fists," and pulled out a pistol with which he hit Thompson's face and back of her head. (*Id.* at 14:39–15:30, 49:17). Thompson-James told Officer Fawcett that, during the altercation in the bedroom, Thompson did not hit or push Defendant. (*Id.* at 16:03–04, 16:29–34). Thompson-James said that this wasn't the first time Defendant hit Thompson, but it was the first time he pistol-whipped her. (*Id.* at 16:05–10). Thompson-James had "no idea" where Defendant left the weapon after the altercation or where it could be located. (*Id.* at 16:12, 34:28). Thompson and Thompson-James described the pistol as small silver revolver with a black handle. (*Id.* at 36:56–37:07, 48:52–49:08). Thompson also told Officer Fawcett that Defendant had the pistol in his boot. (*Id.* at 37:10–11).

After paramedics examined Defendant's injuries, Defendant asked Officer Clark if she could walk him to the backyard to get a cigarette from Eric. (Govt. Ex. 3 at 15:17–39). The two walked to the backyard of the Residence, where Defendant spoke with Eric and smoked a cigarette. (*Id.* at 15:40–17:18). A few minutes later, Officer Fawcett approached the three of them. (Govt. Ex. 1 at 23:12; Govt. Ex. 3 at 17:30). Officer Fawcett informed Defendant that he was going to be arrested for assault family-violence battery and read Defendant the *Miranda* warnings. (Govt. Ex. 1 at 24:57–25:20). Defendant was arrested

7

approximately 23 minutes after he was first detained. (*See generally* Govt. Ex. 1). Defendant waived his right to remain silent, agreed to speak with Officer Fawcett, and consented to a search of the Ford F-150. (*Id.* at 25:20– 26:39).

## DISCUSSION

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. To safeguard this privilege against self-incrimination, a person must be warned prior to a custodial interrogation that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (*Miranda* warnings). "[T]he Fourth Amendment does not [however,] prohibit a police officer, 'in appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest[.]'" *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). Accordingly, officers are allowed to make what are commonly called *Terry*[4] stops, which are "justified to give the police an opportunity to engage in brief and nonintrusive investigation techniques, such as noncustodial questioning of the detained person." *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988). "No brightline test separates an investigatory stop from an arrest." *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995). A *Terry* stop does not necessarily constitute custody for purposes of *Miranda* even if the suspect is not free to leave. *United States v. Shaw*, No. 24-10266, 2025 WL 2718481 (11th Cir. Sept. 24, 2025); *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). Importantly, pre-custodial questioning during a *Terry* stop does not require *Miranda* warnings. *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006).

---

[4]    *Terry v. Ohio*, 392 U.S. 1 (1968).

8

Here, Defendant identifies several statements that he contends are subject to suppression under the Fifth Amendment. (*See* Doc. 44 at 5–6). The Government counters that, because Defendant's statements were pre-custodial and made during a *Terry* stop, the statements should not be suppressed. (Doc. 35 at 5; Doc. 45 at 2; Doc. 43 at 41:7–8). Accordingly, the question before the Court is whether Defendant's detention was reasonable under *Terry* or if it had ripened into a full-scale arrest when the statements in question were made. In evaluating the reasonableness of an investigatory stop, courts consider the "totality of the circumstances, . . . including the law enforcement purposes served by the detention, the diligence in which the police pursue[d] the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (internal quotation marks and citations omitted).

Officer Fawcett was called to the scene of an alleged domestic dispute in which the purported complainant said that she had been pistol whipped. The complainant had a visible bump on her head, was bleeding and accused Defendant of assaulting her. She was agitated and yelling, and Defendant ignored commands to turn around. Officer Fawcett had to threaten to tase Defendant before Defendant cooperated with instructions to turn around despite being told multiple times, "I'm going to detain you until I know what's going on." (Govt. Ex. 1 at 01:21–25). That Defendant was placed in handcuffs or that Officer Fawcett drew his taser "does not, as a matter of course, transform [this] investigatory stop into an arrest." *Blackman*, 66 F.3d at 1576; *see United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985) (handcuffing does not automatically convert an investigative detention into an arrest and police may take reasonable action to protect themselves during investigative detentions); *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989) (same); *Acosta*, 363 F.3d at 1147 (citations omitted) (same).

When determining "whether the investigative detention of [Defendant] was sufficiently limited in scope and duration to remain within the bounds permitted by *Terry v. Ohio* and not ripen into a full-scale arrest unsupported by probable cause," the Eleventh Circuit said that "the most important factor is whether the police detained [the defendant]

9

to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." *Hardy*, 855 F.2d at 759 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). The method of investigation here was to talk to the complainant, Defendant, and the other two people present to determine what had happened and then to look for the weapon once an independent witness confirmed the presence of one. It took approximately 23 minutes from the time Defendant was initially detained to complete the investigation. Five of those 23 minutes were spent waiting for a second officer to arrive so that the investigation could proceed safely. The officers pursued the investigation diligently and did not detain Defendant for any amount of time longer than necessary to complete their investigation. *See Gil*, 204 F.3d at 1351. Additionally, the scope and intrusiveness of the detention were reasonable. Even though Defendant was handcuffed, (1) Officer Fawcett loosened the handcuffs, (2) both officers allowed Defendant to walk around the driveway, (3) both officers gave Defendant his drink when he asked for it, (4) Officer Fawcett looked for Defendant's cigarettes at his request, and (4) Officer Clark allowed Defendant to smoke a cigarette with Eric in the backyard. Considering the totality of the circumstances surrounding Defendant's detention, Defendant's detention did not exceed that allowed by *Terry*. Therefore, Officer Fawcett and Officer Clark's pre-custodial questioning did not require *Miranda* warnings. *See Street*, 472 F.3d at 1309.

Even if Defendant had been in custody rather than detained pursuant to *Terry*, the Supreme Court has established a narrow exception to *Miranda* when a threat to public safety exists. *New York v. Quarles*, 467 U.S. 649, 657–58 (1984). This exception allows officers to question a suspect in custody without first *Mirandizing* him if it is necessary to protect either themselves or the general public. *Id.* at 655–58. In *Quarles*, the Supreme Court concluded that, because law enforcement was "confronted with the immediate necessity of ascertaining the whereabouts of a gun[,]" the custodial interrogation was permissible. *Id.* at 657. "[T]he need for answers to questions posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.*; *see also United States v. Newsome*, 475 F.3d 1221

10

(11th Cir. 2007); *United States v. Williams*, 784 F. App'x 707 (11th Cir. 2019) (per curiam). *Williams* is particularly instructive. In *Williams*, two officers were dispatched to a domestic dispute where a weapon was present. 784 F. App'x at 710. There were multiple people at the house, including the complainant. *Id.* When the complainant informed the officers that there was a gun in the house, one of the officers immediately asked the defendant if he knew where the gun was located—"[h]e did not ask [the defendant] if it was his gun, where the gun came from, or how he obtained the gun, but only if he knew the gun's location." *Id.* The Eleventh Circuit held that the officer's "questions as to the location of the firearm were proper to protect himself, his fellow officer, and the other individuals on the scene[.]" *Id.* In this case, Officer Fawcett was responding to a domestic dispute, and the complainant and a witness stated that Defendant had hit the complainant with a gun. Defendant denied possessing a gun, and Officer Fawcett did not know where the gun was. Accordingly, asking questions to determine if there was, in fact, a gun and where the gun was was necessary to protect those present at the house as well as the officers; and the public safety exception would apply.

Finally, Defendant made several statements without being asked a question. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in Miranda]." *Miranda*, 384 U.S. at 478; *United States v. Cartwright*, 183 F. Supp. 3d 1348, 1357 (M.D. Ga. 2016). Unprompted and unsolicited statements, spontaneously initiated by a defendant are neither protected by the Fifth Amendment right against self-incrimination, nor related in any manner to *Miranda* warning questions. *United States v. Espinosa-Orlando*, 704 F.2d 507, 513-14 (11th Cir. 1983); *see Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991). Accordingly, Defendant's voluntary statements are not protected by the Fifth Amendment.

11

**CONCLUSION**

For the reasons set forth above, Defendant's Motion to Suppress Statements (Doc. 28) is **DENIED**.

**SO ORDERED**, this 20th day of March, 2026.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

12